IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JODY SCHERWINSKI,

                Plaintiff,

v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

                Defendant.

OPINION AND ORDER

17-cv-532-wmc

Pursuant to 42 U.S.C. § 405(g), plaintiff Jody Scherwinski seeks judicial review of a final decision of defendant Nancy A. Berryhill, the Acting Commissioner of Social Security, which denied her application for Social Security Disability Insurance Benefits. On appeal, plaintiff raises three challenges: (1) the Administrative Law Judge ("ALJ") erred in failing to consider the third-party statement of Scherwinski's significant other in determining her residual functional capacity ("RFC"); (2) the ALJ erred in several respects in formulating her RFC; and (3) the ALJ erred by failing to explain why Scherwinski was capable of working eight-hour days, five days a week. The court held a telephonic hearing on Scherwinski's appeal on May 14, 2019, at which the parties appeared by counsel. For the reasons provided below, the court will affirm the Commissioner's denial of benefits.

BACKGROUND[1]

A. Overview of Claimant

Scherwinski was born on February 6, 1976. She applied for social security disability

---

[1] The administrative record ("AR") is available at dkt. #8.

benefits and supplemental security income payments on March 20, 2014, approximately two and a half years after her claimed disability onset date of September 15, 2011. This made Scherwinski 35 years-old on the alleged onset date of her disability in 2011; 38 years-old when she applied for disability in 2014; and 40 years-old at the time of her hearing in 2016.

Scherwinski has at least a high school education, is able to communicate in English, and has past work experience as a store laborer, which is medium, unskilled work. Scherwinski last engaged in substantial gainful activity on her alleged disability onset date in 2011. Scherwinski claims disability based on her neck and back pain, left shoulder problems, left elbow problems, right foot arthritis, dizziness, and asthma. (AR 22, 247.) Scherwinski further claims that she is unable to lift more than ten pounds, has limited neck movement, experiences shortness of breath, has severely limited grip strength, and can only stand for about an hour and sit for 20 to 30 minutes at a time. (*Id.*)

B. **Medical Record**

A significant portion of the medical record in this case covers the year leading up to Scherwinski's alleged disability onset date. The court will first recount this portion of the record in summary form -- focusing on the medical records which touch on her severe impairments -- but then also point out records relevant to Scherwinski's approach to medical treatment more generally.

1. **Pre-disability**

In the fall of 2010, Scherwinski underwent left ulnar nerve transportation surgery.

In a September 21, 2010, post-operation appointment with Thomas Hitchcock, M.D., he noted that Scherwinski "has been able to complete an 8 hour day at work without difficulty" *and* "is also independent for all self cares and home management tasks." (AR 324.)

In late 2010 into early 2011, Scherwinski had a series of medical appointments concerning pressure behind her left eye and related headaches and nosebleeds, the latter of which appear to have been successfully treated by an ENT doctor. (AR 321, 384, 400-02 A November 2010 MRI and March 2011 MRI both showed that her brain was normal, though both also noted a sinus cyst "nonspecific in nature;" the latter MRI indicated that this cyst was unchanged. (AR 315-16, 319-20.)

Beginning in February 2011, Scherwinski had a series of appointments with her treating physician Timothy Lindgren, M.D., and other health care professionals concerning gastrointestinal / low abdomen symptoms. (AR 369-81.) In all of these appointments, Scherwinski either requested that Lindgren complete work excuses or clear her to return to work. Scherwinski refused to take a probiotic or liquid medication when offered.[2]

Scherwinski also saw an OB/GYN, who ordered a CT scan that showed an ovarian cyst and possible endometriosis. Ultimately, all of these issues resolved, or at least, abdominal pain or gynecological complications are not a basis for her claim of disability.[3]

At some point in the spring of 2011, Scherwinski was seen by a nephrology doctor

---

[2] This appears to be the first of several references in her medical record of her refusal to take pills.

[3] The record also contains a March 9, 2011, x-ray of the left quadrant of her abdomen that same day found "no acute pulmonary infiltrate." (AR 316.)

3

to address kidney cysts, likely related to Gitelman's syndrome.[4] Scherwinski's blood work showed vitamin deficiency, but she refused to take supplements to address this. Dr. Lindgren repeatedly expressed frustration about her refusal to take medication, suggested a referral to psychiatry, and referred her to a colleague for a second opinion. A second opinion from Amit Chauhan, M.D. on March 21, 2011, found nothing abnormal. (AR 397-99.)

In April 2011, Scherwinski was seen in the ER for dizziness. (AR 310-15.) The ER doctor indicated that this could be tied to her labs showing low magnesium and potassium, and encouraged her to fill her supplement prescriptions, though her reluctance caused him to "suspect" that she would not do so. In follow-up appointments, Dr. Lindgren continued to express frustration with her failure to take medication, noting: "[i]t simply baffles me how she has been unwilling to initiate these medications"; and "[s]he continues to be very frustrating patient to deal with." (AR 410-11.)

On June 2, 2011, Scherwinski saw Dr. Lindgren to reevaluate her medical needs and work capabilities. (AR 414-17.) At that time, Lindgren noted "some behavioral changes, particularly her tendency to overdramatize her systems and many of her dramatic symptoms have never been witnessed by other friends or family including recurrently described nosebleeds, drainage from the ears." (AR 415.) In response to her continued

---

[4] "Gitelman syndrome is a kidney disorder that causes an imbalance of charged atoms (ions) in the body, including ions of potassium, magnesium, and calcium. The signs and symptoms of Gitelman syndrome usually appear in late childhood or adolescence. Common features of this condition include painful muscle spasms (tetany), muscle weakness or cramping, dizziness, and salt craving. Also common is a tingling or prickly sensation in the skin (paresthesias), most often affecting the face." "Gitelman syndrome," U.S. National Library of Medicine, https://ghr.nlm.nih.gov/condition/gitelman-syndrome.

refusal to take medication, Lindgren noted, "[s]he reports some sense of distrust in medication but this is not a logical explanation." (AR 415.) He again suggested a referral to psychiatry, but she refused.

On June 23, 2011, Scherwinski had an occupation medical consultation with Steven R. Kirkhorn, M.D., for assessment of work restrictions and vertigo. (AR 419-21.) Kirkhorn noted that the MRI and CT scans were normal, that Scherwinski reported that her dizziness is 80% better and that she was "having much fewer symptoms." (AR 420.) Her physical exam was also unremarkable. In the end, Kirkhorn found her "permanent partial disability" at 0% and released her to "full duty." (AR 421.)

In July 2011, however, Scherwinski began complaining of left shoulder pain. (AR 423-25.) The medical record states that: "She was out kayaking and felt a pop in her shoulder and pain in her shoulder and scapula, but has not noticed any limitation of movement. She has had surgery on her shoulder in the past." (AR 423; *see also* AR 428-31 (Lindgren visit in which he describes that she was "involved in a kayak race, very vigorously working at this and she felt something pop in her left shoulder").) The physical exam revealed no tenderness and full range of motion. (AR 424.) An x-ray of her left shoulder was normal, "bones are intact and negative for fracture. Joint spaces are well maintained." (AR 306.) Around this time, Scherwinski also began complaining of neck pain (AR 429.)

2. **Post-Disability Onset Date**

While there are no medical records for almost a three year period after her alleged onset disability date of September 15, 2011, there is a reference in a medical record from

5

2015 that she lacked insurance in 2011, which may explain this gap. However, Scherwinski did not raise this gap in treatment during the administrative process or on appeal, nor did the ALJ rely on the gap in finding her not disabled.

On June 5, 2014, Scherwinski saw Alice K. Schmutzler, N.P., for "physical exam, pre-employment" with plans to work at a daycare. (AR 432-35.) During the visit, Scherwinski complained of cervical pain and limitations of movement, reporting that "[s]he is only able to turn about 20 degrees to the right, 20 degrees to the left without experiencing pain." (AR 432.) Scherwinski also reported that: "She does try to exercise regularly. She snowshoes, likes to bike and swim. She does it as often as tolerated." (AR 432-33.) In review of symptoms, Scherwinski "[d]enie[d] shortness of breath out of the ordinary." (AR 433.) She also denied "wheeze, stridor or pleuritic-typic chest pain," as well as "[d]en[ying] tremors, lightheadedness, dizziness, muscle weakness or headaches" and reported "[n]o coordination difficulties." (AR 434.)

In contrast, physical exam notes for Scherwinski's neck state: "Limited range of motion. She can only turn about 10 to 15 degrees to right or left without experiencing pain. She does not have cervical pain in her neck. She is not able to put her head backwards without pain or chin to chest without pain." (AR 434.) N.P. Schmutzler released her to work part-time with lifting restriction of 10 pounds, and "no fast or turning of the head or jerking." (AR 435.)

On July 21, 2014, Scherwinski was also seen by Mark A. Huftel, M.D., for asthma

6

treatment, during which he prescribed her a new inhaler. (AR 456.)[5] A later medical record, dated August 29, 2014, noted multiple attempts to reach Scherwinski regarding her asthma medication without a response. (AR 451.) In October, Scherwinksi had a follow-up appointment with Dr. Huftel to address asthma and allergies. (AR 445-48.) A spirometry test administered that same day noted, "Normal spirometry values. Abnormal flow volume loop, question upper airway component or patient's ability to perform the test. Clinical correlation recommended." (AR 468-69.) Dr. Huftel referred her to speech pathology. In that appointment on November 3, Scherwinski was diagnosed with "vocal fold dysfunction/irritable larynx," which could be the reason for shortness of breath. (AR 444.) The speech pathologist suspected GERD as the trigger for this condition, and on November 6, 2014, Dr. Huftel prescribed liquid medication, an acid blocker, for GERD. (AR 442-43.) However, a November 13 medical entry noted Scherwinski's failure to pick up the prescription. (AR 441-42.)

On August 26, 2014, Scherwinski saw Dominic S. Chu, M.D., for pain in her neck. Scherwinski mentioned a snowboarding incident as the cause of that pain. She also mentioned experiencing some weakness and numbness of the left hand as compared to the right, but "[o]therwise no real change in general health from the neck pain." (AR 452.) The physical exam revealed "some tenderness on the lower cervical spine around the paraspinous muscle at C4-5. Range of motion of the neck is slightly reduced with extension and bending to both sides." (AR 452.) Dr. Chu also noted "slightly weaker" hand grip on

---

[5] The treatment notes mention that she has a new living environment, having recently moved in with her boyfriend.

7

the left side. (*Id.*) Dr. Chu suggested she try trigger point injections and try lidocaine gel for some muscle relaxation. (*Id.*) Consistent with that recommendation, on October 1, 2014, Scherwinski received trigger point injection for myofascial pain from Thomas H. Simpson, M.D. (AR 445.) In early 2015, Scherwinski also had a cervical diagnostic medical branch block done by Shiqiang Tian, M.D. to address her neck pain. (AR 533-34.)

On April 20, 2015, Scherwinski returned to Dr. Chu for treatment of her neck pain. Chu reported that the "[e]xam today revealed some tenderness over the lower cervical spine. Range of motion is slightly reduced in extending and bending to both sides. Muscle strength intact in both upper extremities. Very good hand grip on both sides." (AR 526.) He prescribed an exercise program and Tizanidine, and he suggested Scherwinski obtain an MRI to compare to old findings.[6]

In February 2015, Scherwinski began complaining about shoulder pain, and had an occupational therapy evaluation for treatment of that pain. (AR 496-99.) She reported her "most recent increase in discomfort occurred after she was lifting wood from a wood pile at above shoulder height and placing it into a boiler." (AR 496.) Scherwinski also reported that she was using ice to treat it, and that she had received a Tramadol prescription, but was not using it. In March, Scherwinski also saw Lori H. Sharrow, N.P., about left upper back pain, scapular area, who took noted of "palpable pain over the left scapular area. She has full range of motion of the left upper extremity." (AR 531.) Sharrow referred her to physical therapy and instructed Scherwinski to take Tylenol or

---

[6] A note from June 9, 2015, indicates that an MRI technician called and reported to Dr. Danial that Scherwinski was not able to go through with MRI because she was in too much pain laying down. (AR 516.)

8

ibuprofen.

Scherwinski was discharged from occupational therapy for her shoulder pain on June 9, 2015. (AR 477-78.) "Patient has participated in outpatient Occupational Therapy since her initial evaluation on 4/21/2015 with overall improving progress." (AR 477.) The notes also indicate that Scherwinski's "pain [h]as plateaued to approximately what she reports to be her baseline. She reports she continues to have occasional scapular popping. She states she is able to manage this well. Patient typically rates her pain 2 to 4/10 during her last 2 visits." (*Id.*)

In April 2015, Scherwinski began complaining of right foot pain. She had an x-ray on April 7, 2015, which showed "[n]o evidence of fracture or subluxation is seen. No other osseous or articular abnormalities identified." (AR 501.) Nevertheless, on April 17, 2015, Scherwinski saw Louay O. Danial, M.D. for right foot pain and decreased hearing. (AR 528-29.) She was then referred to podiatry and ENT.[7] On May 13, 2015, Scherwinski saw podiatrist Marilyn Pontone, DPM, for "right foot pain [for] years." (AR 488-89.) Scherwinski reported injuring it in an accident in 2011 when a tractor ran over and pinned her foot and she continues to suspect that she may have fractured her foot. Pontone prescribed a custom-molded orthotic.

On January 12, 2016, Scherwinski met with Dr. Chu to fill out a form for the county's welfare department to get excused from the work requirement. (AR 505.) His physical examination of Scherwinski revealed, "only mild restriction with extension and

---

[7] Scherwinski was subsequently fitted with a hearing aid.

bending the neck on both sides. Somewhat tender with palpation of the muscles of the neck." (AR 505-06.) Chu also noted, "I told her there is no really objective finding or MRI scan finding to support that she cannot do any kind of work qualifying her for the exemption for the county work system." (AR 506.)

On February 25, 2016, Scherwinski saw N.P. Schmutzler for right elbow pain. Scherwinski "reports that she was shoveling snow a few days ago and she was holding a shovel and it jammed into her right elbow." (AR 664-65.) She reports that she "has difficulty grasping, she also has difficulty with pain in her elbow," rating it at 5 out of 10 when resting or 7 or 8 out of 10 when using it. Schmutzler also obtained an x-ray, which revealed no factures or dislocation. During an April appointment, Schmutzler referred her to occupational therapy.

On April 26, 2016, Scherwinski saw High P. Bogumill, M.D., again for right elbow pain. (AR 668-71.) During the appointment, Scherwinski noted that she just bought a house that they were remodeling, but that "[s]he is having difficulty helping because of the pain in her arm." (AR 669.) The physical examination revealed "[r]ange of motion of the elbow was full. Strength with resisted flexion and extension of the elbow was full. No instability of the elbow was evident on exam today." (AR 669.) Still, Dr. Bogumill administered an injection.

On May 4, 2016, Scherwinski had an appointment with James E. Mullen, M.D., for "neck and left arm, low back, left leg complaints." (AR 659-61.) Mullen noted that the 2014 MRI did not reveal any significant spondylosis. Scherwinski reported that she "[e]njoys hunting, ATVs and kayaking. Previously enjoyed snowboard, snowmobiling and

swimming." (AR 660.) Dr. Mullen prescribed stretches to address her back pain.

## C. ALJ Opinion

Following an evidentiary video hearing held on April 28, 2016, at which Scherwinski appeared with the same counsel representing her in this action, the ALJ found that she had the following severe impairments: myofascial neck pain, left shoulder tendonitis, a history of left ulnar nerve entrapment[8] post ulnar nerve transposition with reported pain and parathesias, right foot arthritis, Gitelman's syndrome, a history of vertigo and asthma. (AR 20.)

As for her residual functional capacity, the ALJ concluded that she could perform

> sedentary work as defined in 20 CFR 404.167(a) and 416.967(a) except the individual may never climb ladders, ropes or scaffolds; and may occasionally kneel and crawl. The individual may only occasionally reach overhead bilaterally and may frequently handle and finger with the left hand. The individual may do no work requiring frequent, rapid, head movement. The individual may have no exposure to temperature extremes, concentrated levels of airway irritants, unprotected heights or hazards.

(AR 22.)

The ALJ then reviewed Scherwinski's evidence to support her various impairments, focusing on the medical record. With respect to vertigo and dizziness, the ALJ noted that

---

[8] "Ulnar nerve entrapment occurs when the ulnar nerve in the arm becomes compressed or irritated. The ulnar nerve is one of the three main nerves in your arm. It travels from your neck down into your hand, and can be constricted in several places along the way, such as beneath the collarbone or at the wrist. The most common place for compression of the nerve is behind the inside part of the elbow. Ulnar nerve compression at the elbow is called 'cubital tunnel syndrome.' Numbness and tingling in the hand and fingers are common symptoms of cubital tunnel syndrome." "Ulnar Nerve Entrapment at the Elbow," OrthoInfo, https://orthoinfo.aaos.org/en/diseases--conditions/ulnar-nerve-entrapment-at-the-elbow-cubital-tunnel-syndrome/.

11

while there are treatment notes describing these symptoms in 2011, "longitudinal treatment records subsequent to the claimant's alleged disability onset date do not document ongoing treatment or symptoms of dizziness or vertigo." (AR 23.) As for her claims of neck, back and left shoulder pain, the ALJ discounted these based on "radiographic examinations did not reveal any significant degenerative changes in her spine or left shoulder, and her back pain was noted to be secondary to a myofascial pain syndrome, and her shoulder pains were noted to be related to tendonitis." (AR 23.) As for her left hand strength, the ALJ acknowledged her 2011 surgery for left ulnar nerve repair, but noted that medical records from 2016 indicated that her grasp strength was 5/5 on her left. (AR 25.) As for her right elbow injury, the record revealed no fracture or dislocation and that she completed physical therapy which provided some help. As for her right foot pain, the ALJ noted that the medical records "do not document reports of significant ongoing right foot pain and limitations, and that the treatment was limited to orthotics." (AR 26.) The ALJ also indicated that the x-rays revealed "minimal osseous pathology." (*Id.*) The ALJ reasoned that "[t]he limited radiographic findings and the lack of objective findings related to gait problems and neurological loss are inconsistent with the claimant's complaints of significant ongoing limitations related to the right foot injury." (*Id*.) The ALJ also addressed her history of asthma, but notes that "the records do not document significant ongoing treatment addressing asthma exacerbations." (*Id.*) Finally, the ALJ addressed Scherwinski's boyfriend's third party function report, but discounted it because it was not consistent with the record.

The ALJ also reviewed the state agency consultants' opinions restricting Scherwinski

to sedentary work, placing "some weight" on those opinions because they were generally consistent with objective evidence in the record, but added limitations to account for some of Scherwinski's subjective complaints. (AR 26.) Specifically, he credited N.P. Schmutzler's June 5, 2014, treatment note that restricted Scherwinski to "no fast turning or jerking of her neck" and adopted this limitation in the RFC. (AR 26.) The ALJ further considered Scherwinski's daily activities, finding them "inconsistent with a finding of total disability." (AR 27.) In addition to noting her daily activities, he gave weight to her own reports to treating physicians in 2014 that she snowshoed, swam and biked.

While the ALJ concluded, consistent with the Vocational Expert's testimony and his RFC limiting her to sedentary work, that Scherwinski was unable to perform her past relevant work, the ALJ ultimately found there were sedentary jobs that could accommodate Scherwinski's RFC restrictions in significant numbers in the national economy, including document preparer and telephone clerk. (AR 27-28.) As such, the ALJ concluded that Scherwinski could perform that work and had not been under a disability from September 15, 2011, through the date of his decision. (AR 28-29.)

OPINION

The standard by which a federal court reviews a final decision by the Commissioner of Social Security is well-settled. Findings of fact are "conclusive," so long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). When reviewing the Commissioner's findings under § 405(g), the court cannot reconsider facts, re-weigh the

13

evidence, decide questions of credibility or otherwise substitute its own judgment for that of the ALJ. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Accordingly, where conflicting evidence allows reasonable minds to reach different conclusions about a claimant's disability, the responsibility for the decision falls on the Commissioner. *Edwards v. Sullivan*, 985 F.2d 334, 336 (7th Cir. 1993). At the same time, the court must conduct a "critical review of the evidence," *id.* at 336, and insure the ALJ has provided "a logical bridge," *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018).

Here, Scherwinski's counsel contends in somewhat cursory fashion that the ALJ erred in three respects: (1) failing to give proper consideration to her boyfriend's statement; (2) formulating her RFC; and (3) failing to explain why Scherwinski was capable of working eight-hour days, five days a week.[9] Her counsel emphasized the first of these claimed errors during oral argument, but none are sufficient, separately or collectively, to warrant remand for the reasons explained below.

I. **Consideration of Third-Party Statement**

Scherwinski contends that the ALJ erred by "totally ignoring" Scherwinski's live-in boyfriend William DeBartolo statement. (Pl.'s Opening Br. (dkt. #10.) DeBartolo completed a third-party function report dated August 11, 2014. (AR 266-74.) In the report, he describes her limitations as follows:

> She can't use a broom with her left hand, or carry a Walmart bag heavier than about 5 lbs without using her wrist to hold it.

---

[9] Plaintiff's opening brief spans 57 pages, but for reasons which are entirely unclear, approximately 50 of those pages consist of simply copying and pasting the hearing transcript. **This is not helpful.** The court has access to the entire administrate record, including the hearing transcript. There is no reason to copy and paste extensive portions of the record into a brief.

> She can't sit upright for more than 15 minutes without having to lay down to find a less painful position to support her neck. She can't swallow pills for pain relief as she will just throw up and vomit anything in pill form. I have to help her bathe, and help support her getting in and out of the tub. She cannot wash dishes by hand. Opening and closing a door is a long ordeal if she has to bring something in the house with only her one functional arm and shoulder. As she has to get the item down to open and close the door. Doing all only with her right arm. Apparently she suffered some head injury in the past. She seems to often get confused at time. She is often bed ridden due to dizziness caused by chronic neck pain.

(AR 266, 274.)

Contrary to Scherwinski's characterization, the ALJ did not ignore DeBartolo's statement. To the contrary, the ALJ not only acknowledged his function report in his decision, but found DeBartolo's inconsistent with the medical record, which he recounted at length. (AR 26.) In support of this basis for reversal, Scherwinski principally relies on SSR 96-7p, which, in pertinent part, requires the ALJ to "consider the entire case record, including . . . statements and other information provided by . . . other persons about the symptoms and how they affect the individual." But the ALJ did just that: as explained in his decision, the ALJ considered the entire record, including DeBartolo's statement, in crafting Scherwinski's RFC.

Regardless, the ALJ's treatment of DeBartolo's third-party functional report must be viewed in the context of the entire decision, or at least the relevant discussion justifying the RFC. To require the ALJ to repeat his analysis in explaining why he was discounting DeBartolo's statements would have been repetitive, and it was unnecessary. *See Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004) (rejecting "needless formality to have the ALJ repeat substantially similar factual analyses"). In the ALJ's lengthy discussion, he

specifically referenced medical records indicating normal grip strength and the lack of radiographic or other evidence to support the full extent of the neck pain and movement limitations claimed by Scherwinski. When faced with the arguably self-interested observations of third-party lay person over a short period of time[10] and a medical record developed over years by the claimant's treating physicians, the ALJ was certainly acting within his discretion in deferring to the latter. As such, the court is in no position to second guess the ALJ and rejects this basis for reversal.

## II. Alleged RFC Errors

Scherwinski next contends that the "the claimant's RFC assessment is simply conclusory and does not contain any rationale or reference to the supporting evidence." (Pl.'s Opening Br. (dkt. #10) 51.) As best as the court can discern, Scherwinski raises the following three specific concerns about the RFC.

### A. Medical Basis

Scherwinski faults the ALJ for not pointing to the opinions of treating and non-treating physicians in adopting physical limitations. Again, this mischaracterizes the ALJ's opinion. While the ALJ pointed to the opinions of the state agency consultants, Drs. Shaw and Khorshidi, in finding that Scherwinski is limited to sedentary work, he also found that those opinions were only entitled to "some weight." (AR 26.) More specifically, the ALJ found their opinions were "generally consistent with the objective evidence in the record,"

---

[10] DeBartolo appears to have completed this report on August 11, 2014, and a July 21, 2014, medical record noted that she had just moved in with him. As such, DeBartolo's statement appears both to be based on a short period of time and self-interested.

but did not fully account for "some of the claimant's subjective complaints." (*Id.*) Accordingly, the ALJ added additional limitations to accommodate: (1) Scherwinski's neck pain and limitations -- "the individual may do no work requiring frequent, rapid, head movement; (2) any hand, shoulder or arm pain -- "may only occasionally reach overhead bilaterally and may frequently handle and finger with the left hand"; (3) any complaints of vertigo or dizziness -- "may never climb ladders, ropes or scaffolds; and may occasionally kneel and crawl"; and (4) her asthma issues -- "may have no exposure to temperature extremes, concentrated levels of airway irritants, unprotected heights or hazards." (AR 22.)

Even so, Scherwinski complains that the ALJ did not adopt the consulting state agency doctors' opinions limiting her to lifting, carrying or pulling no more than ten pounds. However, these restrictions are included in the definition of sedentary work. 20 C.F.R. § 404.1567(a) ("Sedentary work involves lifting no more than 10 pounds at a time and occasional lifting or carrying articles like docket files, ledgers, and small tools."). As such, the ALJ need not have expressly adopted what would have amounted to cumulative weight restrictions.

The court also notes that Scherwinski put forth *no* evidence from a treating physician restricting her ability to work beyond what is contained in the RFC. Indeed, as detailed above, Scherwinski's treating physicians rejected any claim of disability. In a June 23, 2011, report, Dr. Kirkhorn found her "permanent partial disability" at 0% and released her to "full duty." (AR 421.) And in a January 12, 2016, record, Dr. Chu indicated that he refused to sign a form from the county's welfare department to excuse her from the

work requirement. (AR 506.)

B. Lack of Clarity

Next, Scherwinski argues that that ALJ "failed to explain" the parameters of the "may do no work requiring frequent, rapid head movement." (Pl.'s Opening Br. (dkt. #10) 53 (quoting AR 22).) As plaintiff's counsel should know, "frequent" is defined in the Social Security Rulings as "occurring from one-third to two-third of the time." SSR 83-10, 1983 WL 31251, at *6. While "rapid" may not be defined in the regulations, the common definition as "marked by a fast rate of motion" is widely understood. *See* Meriam Webster, https://www.merriam-webster.com/dictionary/rapid (defining "Rapid"). The vocational expert apparently understood this limitation and did not ask for clarification. Regardless, "[w]here, as here, the VE identifies a significant number of jobs the claimant is capable of performing and this testimony is uncontradicted (and it otherwise proper), it is not error for the ALJ to rely on the VE's testimony." *Liskowitz v. Astrue*, 559 F.3d 736, 747 (7th Cir. 2009). The court rejects this basis as well.

C. Contrary to Scherwinski's Testimony

Finally, Scherwinski contends that the ALJ erred in crafting an RFC that is "contrary to the applicant's testimony." (Pl.'s Opening Br. (dkt. #10) 53.) As described above, the ALJ gave ample reasons to discount the full range of Scherwinski's claimed physical limitations based on a lack of support in the medical record. While the ALJ discounted her credibility, he still adopted a very conservative RFC, limiting her to sedentary work with additional physical limitations.

As to the specific impairments that Scherwinski identified in her brief, the ALJ provided compelling bases for discounting her credibility with respect to each:

- Left elbow: The ALJ acknowledged her 2010 surgery, but indicated that there were no recent medical records supporting ongoing grip strength issue, and specifically cited to record demonstrating full grip strength. (AR 25; AR 452 (9/26/14 appointment noting "slightly weaker" hand grip on the left); AR 526 (4/20/15 appointment noting "[v]ery good hand grip on both sides"); AR 657-58 (4/20/16 appointment noting 4/5 grasp strength on the right and 5/5).)

- Left shoulder: The ALJ acknowledged shoulder pain relating to 2011 kayaking injury, but indicated that Dr. Lindgren noted "good range of motion," and further stated that the "radiographic examinations did not reveal any significant degenerative changes in her spine or left shoulder. (AR 23-24.) The court also notes that a 2015 injury to her shoulder appears to have been resolved with physical therapy. (AR 477-78.)

- Right arm: The ALJ acknowledged an injury to her right elbow from shoveling in February 2016. (AR 25.) The x-ray, however revealed no fractures of dislocations. A physical examination also revealed "full range of motion" and" no instability." (AR 668-71.) An April 2016 examination also revealed grasp strength of her right hand of 4/5 (AR 658), and a May 4, 2016, treatment noted indicated that her strength on both sides was 5/5 (AR 661).

- Asthma: The ALJ acknowledged that Scherwinski has asthma but also indicated that the "claimant's treatment records do not document significant ongoing treatment addressing asthma exacerbations." (AR 26.) To the contrary, the record reflects a couple of appointments with Dr. Huftel in 2014, where the results of her spirometry test were normal, she was prescribed asthma medication which she did not pick up, and she was referred to speech pathology and diagnosed with a condition caused by GERD, but failed to pick up the prescription for that condition as well. (AR 441-44, 451, 456, 468-49.)[11]

In short, the ALJ did exactly what was required by setting forth contrary medical evidence before discounting the severity of Scherwinski's claimed impairment.

---

[11] Scherwinski also testified at the hearing about left leg issues, namely difficulty kneeling and a popping sound (AR 60), but the only mention of left leg pain in the record is a May 4, 2016, appointment with Dr. Mullen, where the focus of the appointment was on neck and back pain, not her complaint of leg pain. Regardless, the physical exam was normal. (AR 660-61.)

### III. Ability to Work Full Time

Finally, Scherwinski claims error because the "ALJ's opinion does not include a discussion of whether Scherwinski can work 8 hours a day, 5 days a week as required by SSR 96-8p." (Pl.'s Opening Br. (dkt. #10) 56.) This last argument warrants minimal discussion.

As the Commissioner points out, the regulations define the RFC as a claimant's maximum ability to perform work on an eight-hour per day, five-day per week basis. SSR 96-8p, 1996 WL 374184, at *1. As such, the RFC necessarily takes into consideration Scherwinski's ability to work fulltime. Having rejected Scherwinski's challenges to the RFC, coupled with Scherwinski's failure to develop any argument as to her inability to work full-time, the court rejects this basis for reversal as well.

### ORDER

IT IS ORDERED that the decision of defendant Nancy A. Berryhill, Acting Commissioner of Social Security, denying claimant Jody Scherwinski's application for disability and disability insurance benefits is AFFIRMED. The clerk of court is further directed to enter judgment for defendant and close this case.

Entered this 14th day of May, 2019.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge